UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Antonio Seenyur,

       Plaintiff,

v.

Jennifer Lynne Coolidge, SOTP Program
Director, Minnesota State Prison, Rush
City, individually and in her official
capacity,

       Defendant.

Civ. No. 14-4250 (WMW/BRT)

**REPORT AND
RECOMMENDATION**

Antonio Seenyur (aka Anthony Lee Johnson, Sr.), CDC #K46493, California
Correctional Institution, PO Box 1905, Tehachapi, CA 93581, *pro se* Plaintiff.

Jonathan D. Moler, Esq., Minnesota Attorney General's Office, counsel for Defendant.

BECKY R. THORSON, United States Magistrate Judge.

      Antonio Seenyur, a *pro se* prisoner also known as Anthony Lee Johnson, Sr., has

filed a federal civil rights action against the former clinical director of the Sex Offender

Treatment Program ("SOTP") at the Minnesota prison in Rush City. Seenyur's

complaint, liberally construed, asserts that his termination from the SOTP, placement in

segregation, and transfer to another prison each violated one or more of his constitutional

rights, including his First Amendment right to free speech, Fourth Amendment right

against unreasonable seizures, Fifth Amendment right against compelled self-

incrimination, Eighth Amendment right against cruel and unusual punishment, and

Fourteenth Amendment rights to due process and equal protection.[1] (*See* Doc. No. 1, Compl. 8–10, 12–15; Doc. No. 5, Pl.'s Mem. of Law in Supp. of Compl. 8–11.) The defendant, Jennifer Coolidge, has filed a motion for judgment on the pleadings or summary judgment on each of Seenyur's claims. (Doc. No. 61.) After carefully reviewing the record, this Court concludes that Coolidge is entitled to summary judgment on the merits of Seenyur's claims and, thus, recommends that her motion be granted. This Court further recommends that Seenyur's recently filed motion for leave to amend his complaint (Doc. No. 97) be denied, as he has not shown good cause for waiting over a year after the scheduling order's amendment deadline to seek to amend his complaint.

## I. BACKGROUND

Seenyur is currently serving five consecutive life sentences in California on multiple counts of kidnaping, sodomy, rape, robbery, and assault with a firearm. (*See* Doc. No. 64, Aff. of Jennifer Coolidge, Ex. C at 3; Doc. No. 69, Aff. of Melissa Paquette ¶¶ 2–4; Doc. No. 81, Aff. of Scott Hadrava ¶ 2.) Before that, from October 1994 through April 2015, Seenyur was incarcerated in Minnesota for similar crimes against two underage girls, both of whom he kidnaped, assaulted, and raped. (*See* Coolidge Aff., Ex. C at 1–2; Hadrava Aff., Ex. A; Doc. No. 70, Aff. of Van Coolidge, Ex. A); *State v. Johnson*, No. CO-95-844, 1996 WL 56515 (Minn. Ct. App. Feb. 13, 1996) (affirming

---

[1]     Seenyur also asserted claims against Warden Steven Hammer and SOTP Director Steve Hout, as well as claims concerning the alleged confiscation of mail that he sent to another inmate. (Compl. 11–15.) Those claims were previously dismissed for failure to state a plausible claim for relief and, thus, are no longer part of this lawsuit. (*See* Doc. No. 18, 4/22/15 Order.)

Seenyur's convictions for first-degree criminal sexual conduct and kidnaping of a fourteen-year-old girl); *State v. Johnson*, No. C2-95-179, 1995 WL 634965 (Minn. Ct. App. Oct. 31, 1995) (affirming Seenyur's convictions for theft, kidnaping, and first-degree criminal sexual conduct of a seventeen year old). He served the vast majority of his sentence at the Minnesota Correctional Facility in Stillwater ("MCF-Stillwater"), where it was recommended that he complete a sex offender treatment program before his release. (*See* Hadrava Aff. ¶¶ 2–3 & Exs. A–B; Doc. No. 77, Pl.'s Aff. ¶ 1.)

In April 2013, approximately two years before his scheduled release from state custody, Seenyur was transferred to the Minnesota Correctional Facility at Rush City ("MCF-RC"), where he enrolled in its SOTP. (*See* Van Coolidge Aff. ¶ 3 & Ex. A; Hadrava Aff. ¶ 3.) The purpose of the SOTP is to reduce the risk that convicted sex offenders will reoffend once released from prison. (Doc. No. 65, Aff. of Nancy Stacken ¶ 2.) Defendant Jennifer Coolidge was the Clinical Program Director of the SOTP from May 2012 through October 2014. (Coolidge Aff. ¶ 1.) As a condition of his participation in the SOTP, Seenyur agreed to attend all scheduled programs, complete all assignments given to him by staff, and abide by all prison and program rules. (*Id.*, Ex. A.) Seenyur acknowledged that, pursuant to SOTP rules, he could be terminated from the program if he committed one of several enumerated offenses, including (1) use of illicit drugs or alcohol; (2) "sexual acting out," defined as exposing oneself to others, engaging in sexual behaviors with others, "cruising or window peeking," or possessing pornography; (3) engaging in threatening or assaultive behavior, whether "physical, verbal or implied"; (4) gambling; (5) participating in "fantasy type games (i.e., Dungeons and Dragons)";

and (6) breaching the confidentiality of other participants. (*Id.* at 2; *see also* Stacken Aff., Ex. A.) Under SOTP rules, one of those violations—engaging in threatening or assaultive behavior—mandates termination without the possibility of readmission into the program. (*See* Stacken Aff. ¶ 8 & Ex. C at 2.)

During his pre-treatment phase in the SOTP, which began on June 14, 2013, Seenyur was admonished on separate occasions for sexualizing a female corrections officer and looking into another inmate's cell during an unclothed body search. (*See* Coolidge Aff. ¶ 2 & Ex. B.) Despite those incidents, Seenyur was later admitted to the program for full-time treatment on November 5, 2013. (*See id.*, Exs. B, D.) Thereafter, Seenyur was repeatedly reproached for derailing group therapy sessions through various "persuasion tactics" and, when SOTP staff attempted to quash those tactics, he often became argumentative. (*See id.* ¶ 3 & Ex. B.) Nevertheless, he generally completed his assignments, attended all scheduled programs, and, with few exceptions, was attentive during group discussions. (*See generally id.*, Ex. B.)

The specific events underlying Seenyur's lawsuit began on December 11, 2013, during a group therapy session run by SOTP therapist Steven Fleming. Coolidge intervened in the session after another program participant became disruptive and Fleming was unable to control the group. (Coolidge Aff. ¶ 4.) In an effort to correct the disruptive inmate's behavior, Coolidge asked the other SOTP members to participate in "group feedback," a method regularly employed in group therapy sessions. (*Id.*) When Coolidge called upon Seenyur to provide feedback, he apparently asked her "to clarify what it was she wanted him to say or what she needed him to say." (Compl. ¶ 11.)

4

Believing that Seenyur was simply pretending that "he did not understand what he was expected to do, despite [group feedback] being regularly employed in group therapy sessions," Coolidge instructed Seenyur to return to his living unit for refusing to participate in the exercise. (Coolidge Aff. ¶ 4.)

What happened next is disputed. According to Coolidge, Seenyur "stopped approximately a foot from [her] and glared at [her] silently for about thirty seconds." (*Id.*) After she and Fleming reprimanded Seenyur for his behavior, Seenyur again glared at Coolidge before leaving the room. (*Id.*) Coolidge later drafted an incident report, which asserted that Seenyur "engaged in threatening behavior toward staff" when "he walked within 12 inches of [her]," "glared into [her] face," and then glared at her and Fleming "from a distance of 2 feet[] before [] leaving the room." (Doc. No. 67, Aff. of Sammy Burch, Ex. A.) Seenyur disputes Coolidge's account, asserting that she became enraged after he asked her to clarify what he was supposed to say during group feedback and falsely accused him of glaring at her in a threatening manner. (Compl. ¶ 13.) Seenyur maintains that, after calmly gathering his belongings, he simply looked at Coolidge with "confusion and much disappointment" for mere seconds as he walked past her to leave the room. (*See id.*; Doc. No. 76, Pl.'s Mem. in Opp'n to Summ. J. 3.)

A surveillance video of the incident contradicts Coolidge's current assertion that Seenyur glared at her for thirty seconds from a foot away, though it is not necessarily inconsistent with her contemporaneous incident report. The video, which contains no sound, shows Seenyur looking at Coolidge as he walks past her to the door of the therapy room. He pauses at the door, looks back at Coolidge for approximately eight seconds,

briefly exits the room, and then returns, standing within a few foot of Coolidge and looking in her direction. The nature of Seenyur's various looks at Coolidge cannot be discerned from the video, as his back is often to the camera.[2] (*See* Darling Aff., Ex. B.)

The next day, December 12, 2013, Coolidge terminated Seenyur from the SOTP on the asserted ground that he had engaged in "physically threatening behavior," a rule violation that mandated termination without the possibility of readmission into the program. (*See* Coolidge Aff. ¶¶ 5–6 & Ex. D; Stacken Aff. ¶ 8 & Exs. A, C.) She also filed her incident report with Lieutenant Sammy Burch, the watch commander at MCF-RC. (Burch Aff. ¶ 2 & Ex. A; Coolidge Aff. ¶ 5.) After reviewing the incident report, Lieutenant Burch determined that Seenyur presented a "risk to the security or orderly operation" of the prison and ordered that he be placed in segregation on pre-hearing detention status pending possible disciplinary action. (*See* Burch Aff. ¶ 2 & Exs. A–D; Doc. No. 66, Aff. of Andrew Darling, Ex. C.) In her sworn affidavit, Coolidge states that she had no input in Lieutenant Burch's decision to segregate Seenyur on pre-hearing detention status. (Coolidge Aff. ¶ 5.)

Lieutenant Burch referred Coolidge's incident report to MCF-RC's discipline unit. (Doc. No. 68, Aff. of Nathan Bartz ¶ 2.) On December 13, 2013, after reviewing the incident report and the available surveillance footage, the discipline unit charged Seenyur

---

[2]    Although the parties dispute whether Seenyur looked at Coolidge in a threatening or intimidating manner, that factual dispute does not preclude summary judgment because it is not ultimately material; it does not affect the outcome of this case under the governing legal principles. For the many reasons discussed below, Seenyur's constitutional claims against Coolidge fail even if, as he claims, he never actually engaged in threatening behavior towards her and other SOTP staff.

with violating prison rules against abuse/harassment, threatening others, and disorderly conduct. (Bartz Aff. ¶ 2 & Ex. A.) Seenyur received notice of the charges and a disciplinary hearing was held before Lieutenant Andrew Darling on December 20, 2013. (*See id.* ¶ 3 & Ex. A; Darling Aff. ¶ 2 & Ex. A.) Based on Coolidge's incident report, the available video footage, and the witness testimony of Coolidge, Fleming, Terry Anderson, and Bart Mollet,[3] Lieutenant Darling found that Seenyur attempted to threaten and intimidate Coolidge, rather than merely giving her a "dirty look," and was therefore guilty of harassment, threatening others, and disorderly conduct.[4] (Darling Aff. ¶¶ 2–3 & Ex. A.) Darling sentenced Seenyur to thirty days of disciplinary segregation with twenty-two days suspended. (*Id.*, Ex. A.) As Seenyur had already spent eight days in pre-hearing segregation (from December 12 through December 20, 2013), he was scheduled for release from segregation that very day. (*Id.*) Darling issued his written decision on December 26, 2013. (*Id.* ¶ 4 & Ex. A.) Lieutenant Van Coolidge, the officer in charge of prison transfers and the defendant's husband, then ordered Seenyur's transfer back to MCF-Stillwater because he had been terminated from the SOTP. (Van Coolidge Aff.

---

[3]     It is unclear from the record whether Anderson and Mollet are prison employees or other SOTP inmates.

[4]     Seenyur asserts that Lieutenant Darling only found him guilty of disorderly conduct, not harassment or threatening others. (Pl.'s Mem. in Opp'n to Summ. J. 15.) That assertion is plainly contradicted by Darling's written disciplinary decision, which expressly found Seenyur guilty of all three offenses. (Darling Aff., Ex. A); *see also Scott v. Harris*, 550 U.S. 327, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

7

¶¶ 2–3 & Ex. A.) According to both Coolidge and Van Coolidge, the defendant played no

part in the transfer decision. (*Id.* ¶ 3; Coolidge Aff. ¶ 6; Doc. No. 83, Aff. of Jonathan

Moler, Ex. B, Def.'s Answers to Interrogs. 6.)

 In January 2014, Seenyur filed grievances against Coolidge with her supervisor,

the associate warden of MCF-RC, and the Minnesota Board of Behavioral Health and

Therapy, complaining that Coolidge wrongfully terminated him from the SOTP based on

a fabricated report that he engaged in threatening behavior. (*See* Compl. ¶¶ 18–20; Doc.

No. 5, Exs. C–G.) Seenyur also complained that Coolidge had not terminated other SOTP

participants—Tony Gohl, Terry Piner, Adam Schaper, and Gerald Thorstad—who

violated rules against engaging in sexual behavior, threatening other inmates, and failing

to complete program assignments. (Doc. No. 5, Ex. E at 3–4.) Seenyur did not, however,

formally appeal Lieutenant Darling's disciplinary decision in accordance with prison

policies, which require an inmate to submit a standard appeal form to their facility's

discipline unit "within 15 working days from the receipt of the hearing findings report."

(*See* Darling Aff. ¶ 4 & Ex. D, DOC Policy 303.010(I).)

 The Board of Behavioral Health dismissed Seenyur's complaint against Coolidge

on June 4, 2014, though it does not appear that prison staff replied to any of his

grievances. (*See* Doc. No. 5, Exs. D, G.) Thereafter, on September 18, 2014, Seenyur

wrote a letter to SOTP Director Steve Hout, complaining that Coolidge wrongfully

terminated him from the program and discriminated against him on the basis of his

African-American race. (Doc. No. 5, Ex. G.) After receiving no response from Hout,

Seenyur filed this lawsuit against Coolidge. (Compl. 12.)

## II. PROCEDURAL HISTORY

Seenyur initiated this case in October 2014. On May 19, 2015, the Court issued a scheduling order under Federal Rule of Civil Procedure 16, setting a deadline of June 5, 2015, for seeking to amend the pleadings, a deadline of November 2, 2015, for completing discovery, a deadline of December 1, 2015, for filing non-dispositive motions (including those relating to discovery), and a deadline of January 4, 2016, for filing dispositive motions. (Doc. No. 23, Pretrial Scheduling Order.) It was anticipated that the case would be ready for trial by May 2, 2016. (*Id.* at 3.) On January 4, 2016, after the close of discovery, Coolidge filed her motion for summary judgment, along with a supporting memorandum and numerous affidavits. (*See* Doc. Nos. 61–70.) The Court granted Seenyur's request for an extension of time to respond to Coolidge's motion and set a deadline of March 4, 2016, for all of the summary-judgment briefing. (Doc. No. 74). After all of the summary-judgment materials were submitted, the Court ordered Coolidge to produce some additional discovery and gave both sides an opportunity to file supplemental briefs addressing the impact of that discovery. (Doc. No. 86.) At Seenyur's request, the Court later extended the deadline for filing supplemental briefs to July 8, 2016. (Doc. No. 90.) After those final briefs were submitted and the Court was prepared to rule on Coolidge's summary-judgment motion, Seenyur filed a motion to amend his complaint on July 14, 2016. (Doc. No. 97, Pl.'s Mot. to Am. Compl.) The Court will address that motion after explaining why Coolidge is entitled to summary judgment on the claims set forth in Seenyur's still operative complaint.

### III. COOLIDGE'S MOTION FOR SUMMARY JUDGMENT

Seenyur claims that Coolidge violated his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights when, in alleged retaliation for exercising his right to remain silent during the group therapy session, she falsely accused him of engaging in threatening behavior, terminated him from the SOTP, and had him placed in solitary confinement and transferred to MCF-Stillwater. (Compl. 6–7; *see also* Doc. No. 5 at 6–13.) He further claims that he was terminated from the SOTP on account of his race, as evidenced by the alleged fact that Coolidge did not terminate four white inmates—Gohl, Piner, Schaper, and Thorstad—who purportedly violated prison or program rules by engaging in sexual behavior, threatening other inmates, failing to complete work assignments, and masturbating to sexual fantasies. (Compl. 8.) Coolidge has moved for judgment on the pleadings or summary judgment on each of Seenyur's constitutional claims. (*See* Doc. No. 61, Def.'s Mot.; Doc. No. 62, Def.'s Mem.)

### A.     Standard of Review

Since the parties have submitted materials outside the pleadings for the Court's consideration, Coolidge's motion will be treated as one for summary judgment only. *See* Fed. R. Civ. P. 12(d); *McAuley v. Fed. Ins. Co.*, 500 F.3d 784, 787 (8th Cir. 2007). Summary judgment is proper if the evidence, when viewed in the light most favorable to the non-moving party, shows no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Thomas v. Heartland Emp't Servs., LLC*, 797 F.3d 527, 529 (8th Cir. 2015). A fact is material when its resolution will affect the outcome of the case, and a dispute about a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001). If it does so, the non-moving party may not rest on mere allegations or denials, but must point to actual evidence of "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(c)(1). The non-moving party must, in other words, "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." *Putman v. Unity Health Sys.*, 348 F.3d 732, 733–34 (8th Cir. 2003) (quotation and brackets omitted). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

**B.     First and Fifth Amendment Retaliation Claims**

Seenyur claims that Coolidge unlawfully retaliated against him for exercising his First and Fifth Amendment rights not to speak during the group therapy session by falsely accusing him of engaging in threatening behavior, demanding his placement in solitary confinement, and having him transferred to MCF-Stillwater. (Compl. 6–7; Doc. No. 5 at 6, 9.) In seeking summary judgment on those claims, Coolidge maintains that Seenyur

had no First or Fifth Amendment right not to participate in the SOTP group therapy session, that the challenged discipline resulted from his violation of prison rules, and that she otherwise played no part in the decision to transfer him to MCF-Stillwater.[5] (Def.'s Mem. 8–9, 12–14.)

---

[5]    In addition to seeking summary judgment on the merits of Seenyur's constitutional claims, Coolidge argues that those claims are procedurally barred under the Prison Litigation Reform Act of 1995 ("PLRA") because Seenyur did not exhaust his administrative remedies by formally appealing Lieutenant Darling's disciplinary decision finding him guilty of harassment, threatening others, and disorderly conduct. (Def.'s Mem. 9–11.) Under the PLRA, an inmate may not challenge a particular prison condition in federal court until he has properly exhausted all administrative remedies available within the prison grievance system for raising that claim. *See* 42 U.S.C. § 1997e(a); *Jones v. Bock*, 549 U.S. 199, 217–18 (2007). Although this Court agrees that Seenyur did not properly exhaust his administrative remedies for challenging Lieutenant Darling's disciplinary decision, he is not directly challenging that decision, but instead claiming that Coolidge herself violated his constitutional rights in connection with his termination from the SOTP, placement in pre-hearing segregation, and transfer to MCF-Stillwater. To that end, he filed grievances against Coolidge with her supervisor, the associate warden of MCF-RC, the Minnesota Board of Behavioral Health and Therapy, and the SOTP Director. Coolidge has not shown that the steps taken by Seenyur were not sufficient to exhaust his constitutional claims against her, as opposed to claims squarely targeted at his disciplinary convictions. *See Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) ("Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion.").

    This Court recognizes that Seenyur's failure to properly appeal Lieutenant Darling's disciplinary decision might bar him from raising claims that necessarily imply the invalidity of that decision. *Cf. Heck v. Humphrey*, 512 U.S. 477, 487 (1994) (holding that a prisoner cannot use § 1983 to either directly challenge an outstanding conviction or to litigate claims that "necessarily imply the invalidity" of that conviction). That would include his retaliation claims, which hinge on the notion that he was falsely accused of engaging in threatening conduct and, thus, implicitly call into question the validity of Lieutenant Darling's disciplinary finding that he did so. But the exhaustion requirement's applicability to such indirect claims raises an unsettled legal question that Coolidge has not addressed, let alone carried her burden of showing. And this Court need not otherwise settle that thorny question here, as Seenyur's claims fail on the merits.

To prevail on a retaliation claim, a plaintiff must demonstrate that (1) he engaged in constitutionally protected activity, (2) the defendant took adverse action against him that "would chill a person of ordinary firmness from continuing in the activity," and (3) the adverse action was motivated by the exercise of the protected activity. *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (citing *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). A plaintiff, in other words, bears the heavy burden of showing that he would not have suffered the alleged mistreatment but for an impermissible retaliatory motive on the part of the defendant. *See Kind v. Frank*, 329 F.3d 979, 981 (8th Cir. 2003); *Orebaugh v. Caspari*, 910 F.2d 526, 529 (8th Cir. 1990). "Merely alleging that an act was retaliatory is insufficient." *Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007). Instead, an inmate must come forward with "evidence that the prison officials were motivated solely by an intent to retaliate against him" for exercising his constitutional rights. *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006).

Moreover, "if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations," acts that a prisoner is "not entitled to perform," then his retaliation claim necessarily fails. *Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993) (quotation omitted). "Thus, a defendant may successfully defend against a retaliatory discipline claim by showing 'some evidence' the inmate actually committed a rule violation." *Santiago*, 707 F.3d at 993 (quoting *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008)). A correctional official's report, "even if disputed by the inmate and supported by no other evidence, legally suffices as

13

'some evidence' upon which to base a prison disciplinary violation, if the violation is found by an impartial decision maker." *Id.* (quotation omitted).

Seenyur's claims for unlawful retaliation fail for several reasons. To begin, the adverse actions that Seenyur complains of all stemmed from conduct that an impartial discipline hearing officer—Lieutenant Darling—found to violate prison rules against harassment, threatening others, and disorderly conduct. While Seenyur denies that he engaged in such conduct, Darling's disciplinary decision was supported by some evidence. *See Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014) ("[W]hen there is a disciplinary decision affirming [an allegedly false charge of violating a prison rule], the critical inquiry is not whether the prisoner alleges that prison officials retaliated against him for participating in constitutionally protected activity, but instead is whether the prison disciplinary committee ultimately found based upon some evidence that the prisoner committed the charged violation . . . .") (quotations omitted). Darling's disciplinary decision was based on Coolidge's incident report, the available video footage, and testimony from four witnesses, including Coolidge and Fleming. (*See* Darling Aff. ¶¶ 2–3 & Ex. A.) Although the record does not reveal what those witnesses testified to, Coolidge's incident report, "even if disputed . . . and supported by no other evidence," alone suffices as "some evidence" to support Lieutenant Darling's disciplinary finding that Seenyur engaged in threatening conduct towards SOTP staff. *Santiago*, 707 F.3d at 993; *see also Sanders*, 773 F.3d at 190–91 (explaining that the some-evidence standard asks only "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board," and does not permit courts "to make an

14

independent assessment of the credibility of witnesses or weigh the evidence") (quotation

omitted). In turn, the disciplinary finding "essentially checkmates [Seenyur's] retaliation

claim." *Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994); *see also Santiago*, 707

F.3d at 993 (holding that a claim that a prison official "filed a false retaliatory conduct

violation" failed as a matter of law where the inmate "was brought before a disciplinary

action board for a hearing at which he was found guilty of assault").

Furthermore, even if this Court were free to disregard Seenyur's disciplinary

convictions and assume that he never engaged in threatening conduct towards Coolidge,

he did not have a First or Fifth Amendment right to refuse to speak during the group

therapy session. While the First Amendment generally encompasses "both the right to

speak freely and the right to refrain from speaking at all," *Wooley v. Maynard*, 430 U.S.

705, 714 (1977), a prison inmate, by virtue of his lawful incarceration, retains only "those

First Amendment rights that are not inconsistent with his status as a prisoner or with the

legitimate penological objectives of the corrections system," *Pell v. Procunier*, 417 U.S.

817, 822 (1974). Correctional systems have a vital interest in rehabilitating convicted sex

offenders through clinical programs, one that is inconsistent with an inmate's refusal to

vocally participate in a sex offender treatment program. *See McKune v. Lile*, 536 U.S. 24,

33, 38–40 (2002) (plurality opinion) (holding that inmates may be subjected to certain

adverse consequences for refusing to speak during a sex offender treatment program,

including transfer to a less desirable prison with fewer privileges and opportunities, given

the "vital interest in rehabilitating convicted sex offenders"); *Pell*, 417 U.S. at 823

("[S]ince most offenders will eventually return to society, another paramount objective of

the corrections system is the rehabilitation of those committed to its custody."). Indeed, as a condition of his participation in the SOTP, Seenyur expressly agreed to perform all assignments given to him by program staff, which would include participating in group feedback when asked to do so. Because participation in a sex offender treatment program bears "a rational relation to a legitimate penological objective," *see McKune*, 536 U.S. at 37, Seenyur was not engaged in activity protected by the First Amendment when he allegedly chose not to speak during the group feedback exercise.

Nor was Seenyur's supposed decision to remain silent protected by the Fifth Amendment. The Fifth Amendment does not guarantee a general right to remain silent, but rather, prohibits a person from being "compelled in any criminal case to be a witness against himself."[6] U.S. Const. amend. V; *see also United States v. Washington*, 431 U.S. 181, 188 (1977) ("The constitutional guarantee is only that the witness be not compelled to give self-incriminating testimony."). While the Fifth Amendment privilege against self-incrimination may be asserted in non-criminal settings, it only protects a person from being compelled "to answer official questions . . . where the answers might incriminate him in future criminal proceedings." *Baxter v. Palmigiano*, 425 U.S. 308, 316 (1976)

---

[6]     The Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), which held that criminal suspects subject to custodial interrogation by law enforcement officials must be warned that they have a right to remain silent, is not to the contrary. *Miranda* simply "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherently compelling pressures of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (quotation omitted). Its safeguards do not apply outside the context of police interrogations and are "not themselves rights protected by the Constitution." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974); *see also Warren v. City of Lincoln, Neb.*, 864 F.2d 1436, 1442 (8th Cir. 1989) (en banc) ("*Miranda* . . . is a procedural safeguard rather than a right arising out of the fifth amendment itself.").

(quotation omitted). Coolidge's request that Seenyur participate in group feedback by reproaching his fellow inmate did not expose Seenyur to a "real danger[]" or "substantial risk" of incriminating himself in future criminal proceedings. *See Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972). Because Seenyur had no First or Fifth Amendment right to remain silent during the SOTP group therapy session, he has not demonstrated that Coolidge impermissibly retaliated against him for engaging in constitutionally protected activity. *See Santiago*, 707 F.3d at 991.

Finally, to the extent Seenyur's retaliation claims concern his placement in segregation pending disciplinary proceedings and transfer to MCF-Stillwater, they fail for an additional reason as well. Liability under 42 U.S.C. § 1983 requires "personal involvement in, or direct responsibility for," the alleged deprivation of a constitutional right. *Mayorga v. Mo.*, 442 F.3d 1128, 1132 (8th Cir. 2006). Regardless of whether Coolidge fabricated her incident report in retaliation for Seenyur's decision to remain silent, the evidence fails to show that she was personally involved in the decisions to place him in segregation or transfer him to MCF-Stillwater. The record shows that the former decision was made Lieutenant Burch and the latter by Lieutenant Van Coolidge.[7]

---

[7]    In his verified complaint, Seenyur asserts that Coolidge contacted unnamed "prison officials and demanded that [he] be locked down in solitary confinement as a direct result of her highly fabricated discipline report . . . ." (Compl. ¶ 14.) Seenyur's conclusory assertion that Coolidge demanded that he be placed in segregation, an assertion unsupported by any specific facts that can be found in the record, is insufficient to create a genuine issue as to Coolidge's personal involvement in the decision to place him in segregation pending the outcome of possible disciplinary proceedings. *See Allen v. Entergy Corp.*, 181 F.3d 902, 906 (8th Cir. 1999) (explaining that conclusory assertions devoid of specific facts rebutting a moving party's evidence cannot create a genuine issue
(Footnote Continued on Next Page)

Despite the record evidence showing that Coolidge was not personally involved in the segregation and transfer decisions, Seenyur suggests that she must have conspired with Burch and Van Coolidge because she works with the former and is married to the latter. (*See* Pl.'s Mem. in Opp'n to Summ. J. 5, 10.) To establish such a conspiracy, however, Seenyur must point to specific facts tending to show an agreement or "'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2010) (quotation omitted). Seenyur has not pointed to any specific facts of an agreement between Coolidge and Burch, or Coolidge and her husband, to retaliate against him by placing him in segregation and transferring him to MCF-Stillwater. That the trio may, as result of marriage or work, have had an opportunity or motive to conspire with one another is not enough. *See Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1050 (D. Minn. 2010) ("[A]lleging that two people had the *opportunity* to conspire—i.e., that they could have met with each other, or called each other, or e-mailed each other—is obviously not sufficient to nudge a conspiracy claim across the line from conceivable to plausible.") (quotation and brackets omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

---

(Footnote Continued from Previous Page)
of material fact); *Miller v. Solem*, 728 F.2d 1020, 1024 (8th Cir. 1984) ("[C]onclusive assertions of ultimate fact are entitled to little weight when determining whether a non-movant has shown a genuine issue of fact.").

Even if the evidence were sufficient to show that Coolidge was personally involved in the segregation and transfer decisions, it would still not support an inference that those decisions—which were ultimately made by Burch and Van Coolidge—were motivated solely by a desire to retaliate against Seenyur for engaging in any constitutionally protected activity. Indeed, there is no evidence in the record to suggest beyond mere speculation that Lieutenant Burch or Lieutenant Van Coolidge were driven by retaliatory motives. *See Webb v. Hedrick*, 409 F. App'x 33, 35 (8th Cir. 2010) (holding that an inmate failed to show that his placement in segregation would not have occurred but for the defendants' retaliatory motives because, "[r]egardless of whether [they] fabricated the disciplinary charge against [him], neither was responsible for [his] placement in administrative segregation pending investigation"); *Kind*, 329 F.3d at 981 (finding retaliation not a "but for" cause of a transfer where the record demonstrated that the inmate was disciplined due to a pattern of misbehavior); *Ponchik v. Bogan*, 929 F.2d 419, 420 (8th Cir. 1991) (rejecting a retaliatory-transfer claim, even where retaliation was a factor in the transfer, because the transfer would still have occurred based on the inmate's misconduct). For each of the foregoing reasons, whether in isolation or in tandem, this Court concludes that Coolidge is entitled to summary judgment on Seenyur's retaliation claims.

## C.    Due Process, Fourth Amendment, and Eighth Amendment Claims

Seenyur also claims that Coolidge violated his Fourth Amendment, Eighth Amendment, and due process rights by having him placed in solitary confinement and transferred to MCF-Stillwater. (*See* Compl. 7; Doc. No. 5 at 8, 11.) In seeking summary

judgment, Coolidge maintains that Seenyur has failed to state a viable claim for violations of his Fourth Amendment, Eighth Amendment, and due process rights. (Def.'s Mem. 8–9.) This Court agrees.

Under the Due Process Clause of the Fourteenth Amendment, state prisoners do not have a constitutionally protected liberty interest in the conditions of their confinement unless those conditions impose an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Fourth Amendment's bar on unreasonable seizures, to the extent it even applies to prison transfers and segregation, guarantees no more, as "[o]fficial action constitutes a seizure when it deprives a person of some meaningful measure of liberty to which he is entitled." *Leslie v. Doyle*, 125 F.3d 1132, 1135 (7th Cir. 1997); *see also Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984) ("A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order."); *King v. McCarty*, 781 F.3d 889, 900 (7th Cir. 2015) (explaining that, at most, the Fourth Amendment protects "prisoners' bodily integrity against unreasonable intrusions *into* their bodies"). And conditions of confinement only implicate the Eighth Amendment's ban on cruel and unusual punishment where they are "sufficiently serious" — that is, where they pose a "substantial risk of serious harm" or involve a significant deprivation of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, or medical care. *Simmons v. Cook*, 154 F.3d 805, 807 (8th Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

As already explained, Seenyur has not presented sufficient evidence to show that Coolidge was personally involved in the decisions to place him in segregation or transfer him to MCF-Stillwater, which were respectively made by Lieutenant Burch and Lieutenant Van Coolidge. He therefore cannot hold Coolidge liable under § 1983 for any alleged constitutional violations arising from his transfer or time in segregation. But even if that were not the case, his Fourth Amendment, Eighth Amendment, and due process claims still fail as a matter of law.

Standing alone, the eight days Seenyur spent in segregation pending his prison disciplinary proceedings does not constitute an atypical and significant hardship sufficient to implicate a liberty interest protected by the Due Process Clause or the Fourth Amendment. *See Sandin*, 515 U.S. at 486 (holding that thirty days in disciplinary segregation did not rise to the level of an atypical and significant hardship relative to the ordinary incidents of prison life); *Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) ("We have consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship.") (quotation omitted); *Hemphill v. Delo*, 124 F.3d 208, 1997 WL 581079, at *2 (8th Cir. 1997) (holding that "four days locked in a housing unit, thirty days in disciplinary segregation, and approximately 290 days in administrative segregation" did "not constitute an atypical and significant hardship when compared to the burdens of ordinary prison life.") (quotation omitted). Nor was it "sufficiently serious to establish an Eighth Amendment violation." *See Rahman X v. Morgan*, 300 F.3d 970, 974 (8th Cir. 2002) (holding that twenty-six months in

segregation, while "quite a long time," was not serious enough to implicate the Eighth Amendment).

As for Seenyur's transfer back to MCF-Stillwater, "a prisoner enjoys no constitutional right to remain in a particular institution." *Saylor v. Nebraska*, 812 F.3d 637, 646 (8th Cir. 2016) (quoting *Goff*, 7 F.3d at 737); *see also Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("[T]he Due Process Clause in and of itself [does not] protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."). With the exception of retaliation for engaging in constitutionally protected activity, a claim that this Court has already rejected, "prison officials may transfer a prisoner for whatever reason or for no reason at all." *Saylor*, 812 F.3d at 646 (quotation omitted). Because Seenyur's placement in segregation and transfer to MCF-Stillwater do not implicate his Fourth, Eighth, or due process rights, Coolidge is entitled to summary judgment on those claims.

In opposing Coolidge's motion for summary judgment, Seenyur claims for the first time that the prison transfer exposed him to a serious threat of physical harm because he was originally transferred out of MCF-Stillwater under a "secret and confidential security" order to protect him from another inmate, Thomas Fox, who he had informed against. (*See* Pl.'s Mem. in Opp'n to Summ. J. 7–8; Pl.'s Aff. 2–3; Doc. No. 82, Aff. of Donald Rothstein ¶¶ 2–3 & Exs. A–B.) That claim is not properly before this Court because it was not presented in Seenyur's underlying complaint, which contains no references to Fox or any other physical dangers that he faced at MCF-Stillwater. *See N.*

22

*States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (explaining that parties are not entitled to "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment"); *Daury v. Smith*, 842 F.2d 9, 15 (1st Cir. 1988) (explaining that a court's duty to liberally construe *pro se* pleadings does not include rewriting a "complaint to contain a count that was not included in it" or give "a plaintiff the license to amend the complaint by memorandum"); *EEOC v. United Parcel Serv., Inc.*, 141 F. Supp. 2d 1216, 1218 n.1 (D. Minn. 2001) ("Because this claim was not alleged in the Complaint, it is not properly before the Court.").

Moreover, even if Seenyur had asserted such a claim in his underlying complaint, it would still fail. While prisoners have an Eighth Amendment right to be protected from harm by fellow inmates, there is no indication that any physical harm actually befell Seenyur after he was transferred to MCF-Stillwater or that Coolidge actually knew of a substantial risk of such harm and deliberately disregarded it. *See Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002) (explaining that prison officials only violate an inmate's Eighth Amendment "right to be protected from harm by fellow inmates" where they deliberately disregard a known and substantial risk of such harm); *Berryhill v. Schiro*, 137 F.3d 1073, 1076–77 (8th Cir. 1998) (explaining that "some actual injury must be shown" to establish an Eighth Amendment claim). Indeed, Seenyur's own affidavit indicates that the alleged security order was "secret and confidential" and not known to anyone at MCF-RC. (Pl.'s Aff. 3 ("On April 18, 2013, I under secret and confidential security was transferred to MCF-Rush City. Know [sic] one at MCF-RC new [sic] this not even the staff members had privilege to know of this information.").) And the

undisputed evidence in the record shows that, by the time Seenyur was transferred back

to MCF-Stillwater, Fox was no longer an inmate there. (Rothstein Aff. ¶ 4.)

## D.    Equal Protection Claim

Seenyur finally suggests that Coolidge terminated him from the SOTP on account

of his race, in violation of the Fourteenth Amendment's Equal Protection Clause. (*See*

Compl. 13–14; Pl.'s Mem. in Opp'n to Summ. J. 11.) In support, he maintains that four

white inmates—Tony Gohl, Terry Piner, Adam Schaper, and Gerald Thorstad—were

allowed to continue in the SOTP even though they violated prison or program rules

against engaging in sexual behavior, threatening other program participants, failing to

complete work assignments, and masturbating to sexual fantasies. (Compl. 14; Doc. No.

5 at 11–12.) In moving for summary judgment on Seenyur's race discrimination claim,

Coolidge maintains that she terminated him from the SOTP because, as later found by a

discipline hearing officer, he engaged in threatening behavior towards herself and

therapist Fleming, a violation that mandated dismissal without the possibility of

readmission under SOTP rules. (Def.'s Mem. 16–18.) Coolidge further notes that

(1) none of the white SOTP participants identified by Seenyur committed a comparable

rule violation, (2) there have been "no instances where a white SOTP participant

attempted to physically intimidate a staff member or other inmates and was allowed to

stay in the program," (3) the four white inmates were eventually "terminated from the

SOTP for their activity in forming a gang," and (4) SOTP records show that

"[a]pproximately 25% of SOTP participants of *any race* are not able to complete the []

program." (*Id.* at 16–17.) Coolidge therefore concludes that there is no evidence that she

treats SOTP "participants of different races differently in her decisions to terminate an individual from the program." (*Id.* at 19.)

The Equal Protection Clause prohibits intentional discrimination on account of race, not merely actions that have a racially disparate impact. *Foster v. Wyrick*, 823 F.2d 218, 220–21 (8th Cir. 1987). Thus, to avoid summary judgment on an equal protection claim, a plaintiff must "identify affirmative evidence from which a jury could find proof of the pertinent motive, race discrimination." *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) (quotation and brackets omitted). Absent direct evidence of racial animus, of which there is none in this case, a prisoner must effectively demonstrate two things: (1) that similarly situated inmates of another race were treated more favorably, and (2) that the difference in treatment is reflective of purposeful racial discrimination. *See id.* (explaining that discriminatory purpose "is most often proved with evidence that similarly situated inmates were treated differently," but that such unequal treatment is not itself "a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination"); *Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996) ("[C]ourts have consistently required equal protection plaintiffs to allege and prove something more than different treatment by government officials."); *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994) (explaining that an equal protection claim typically requires a "threshold showing that [the plaintiff] is similarly situated to those who allegedly receive favorable treatment"); *Inmates of Neb. Penal & Corr. Complex v. Greenholtz*, 567 F.2d 1368, 1374 (8th Cir. 1977) ("It is

incumbent upon plaintiffs to establish that racially disproportionate impact, if there is one, was occasioned by a racially motivated purpose.").

The evidence, even when viewed in the light most favorable to Seenyur, does not support a reasonable inference that Coolidge terminated him from the SOTP because of his race. First, Seenyur has not shown that his purported white comparators were both "similarly situated [to him] in all relevant respects," including in the relative seriousness of their misconduct, and treated more favorably. *See Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1230 (8th Cir. 2013) (quotation omitted). SOTP rules list six major violations that may result in termination from the program: (1) illicit use of drugs or alcohol; (2) "sexual acting out," which is defined as exposing oneself to staff or others, engaging in "sexual behavior with others," "cruising or window peeking," and possession of pornography; (3) threatening or assaultive behavior, whether "physical, verbal or implied"; (4) gambling; (5) playing "fantasy type games" such as Dungeons and Dragons; and (6) breaching the confidentiality of other participants. (*See* Coolidge Aff., Ex. A at 2; Stacken Aff., Ex. A.) Program policies also mandate termination with no possibility of readmission for "assaulting staff or other offenders," which includes threats and intimidation. (Stacken Aff. ¶ 8 & Ex. C.)

Seenyur was both accused and convicted of threatening program staff, a rule violation mandating his dismissal from the SOTP without the possibility of readmission. While he maintains that the four white inmates were not terminated despite engaging in unidentified sexual behavior, threatening other inmates, failing to complete work assignments, and masturbating to sexual fantasies, only one of those alleged actions—

threatening other inmates—is of "comparable seriousness" under SOTP rules, requiring

termination without the possibility of readmission. *See Burton*, 737 F.3d at 1230

(explaining that to be "probative evidence" of purposeful discrimination "the misconduct

of more leniently disciplined [individuals] must be of comparable seriousness"); *see also*

*Klinger*, 31 F.3d at 731 ("The similarly situated inquiry focuses on whether the plaintiffs

are similarly situated to another group for purposes of the challenged government

action."). Indeed, Seenyur himself was reprimanded for sexualizing a female corrections

officer and peering into another inmate's cell during a nude search without being

terminated from the SOTP. (*See* Coolidge Aff. ¶ 2 & Ex. B.) Furthermore, indulging in

sexual fantasies is not listed as a possible ground for dismissal from the SOTP. As

Coolidge cogently explains, terminating a convicted sex offender from the SOTP for

engaging in inappropriate sexual fantasies would thwart the rehabilitative purpose of the

program. (Def.'s Mem. 19.)

     Seenyur has not provided any specific details regarding the other inmates'

allegedly threatening acts, including the circumstances of those acts and, more critically,

whether the inmates were ever caught in the act by prison staff, formally accused of

engaging in threatening conduct, and found guilty of such conduct following a

disciplinary investigation and hearing. The only concrete evidence regarding the inmates'

misconduct while enrolled in the SOTP are official disciplinary records and incident

reports showing that they were either accused or convicted by prison staff of disorderly

conduct and unauthorized control, theft, possession, transfer, or use of property.[8] Those

disciplinary charges stemmed from an episode in which Gohl, Piner, Schaper, and

---

[8]       On May 31, 2016, the Court ordered Coolidge to produce all disciplinary records and incident reports relating to Gohl, Piner, Schaper, and Thorstad while they were enrolled in the SOTP, and gave both sides an opportunity to file supplemental briefs addressing the impact of those documents on Seenyur's race discrimination claim. (Doc. No. 86.) The Court later extended the supplemental briefing deadline per Seenyur's request. (Doc. No. 90.) Seenyur has since filed a self-styled supplemental brief that, despite its title, does not actually address the impact of the materials produced by Coolidge, which she affirms represent all disciplinary records and incident reports for Gohl, Piner, Schaper, and Thorstad during their time in the SOTP. (*See* Doc. No. 91, Pl.'s Suppl. Br.; Doc. No. 93, Def.'s Surreply 1–2.) Instead, Seenyur complains that Coolidge violated the Court's discovery order by failing to turn over certain documents, particularly the therapist case notes and Termination Program Participation Summaries for the four white inmates. (Pl.'s Suppl. Br. 2–6.)

      The Court has construed Seenyur's filing as a motion under Federal Rule of Civil Procedure 37 for contempt sanctions and to compel additional discovery. So construed, the Court has denied that motion by separate order. As more fully explained in that order, the disciplinary records that Coolidge was required to produce did not encompass mental health or treatment records, such as therapist case notes, and any request for such records at this time is both untimely under the prevailing discovery deadline and not likely to lead to information that is relevant and proportional to Seenyur's race discrimination claim. *See* Fed. R. Civ. P. 26(b)(1). Simply put, information regarding Gohl, Piner, Schaper, and Thorstad is only relevant to Seenyur's claim to the extent that it shows that those inmates were not terminated from the SOTP despite being "similarly situated [to Seenyur] in all relevant respects" — that is, similarly accused and convicted of "misconduct . . . of comparable seriousness" to threatening staff members. *See Burton*, 737 F.3d at 1230. That is the type of information that would best be reflected in official disciplinary records, such as incident reports, notice of violations, and written decisions of disciplinary hearing officers, not therapist case notes, treatment records, or other documents only tangentially related to the standard prison disciplinary process.

      Having been given a full and fair opportunity to address the white inmates' disciplinary records, and having failed to do so, Seenyur is not entitled to a second shot at filing an actual supplemental brief. In any event, a second shot at a supplemental brief would not change the outcome of this case, as the other inmates' disciplinary records do not support the conclusion that they were treated more favorably for conduct of similar severity.

Thorstad allegedly formed a short-lived group in November 2013 called the "Bro Club," recruited other SOTP inmates as members, and had those recruits participate in certain initiation activities and obedience requirements, the worst of which involved demanding half of someone else's food at the prison dining hall. (Doc. No. 95, Aff. of Greg Smith, Exs. A–C.) Once the organization came to the attention of Coolidge and other prison staff, Gohl, Piner, Schaper, and Thorstad were promptly terminated from the SOTP, though Thorstad appears to have been readmitted into the program after further investigation revealed that he was not one of the group's leaders. (*See id.*, Ex. A; Stacken Aff. ¶ 9; Pl.'s Suppl. Br. 5.) Gohl and Piner, both of whom admitted to being group leaders, were also charged with, convicted of, and disciplined for violating prison rules against disorderly conduct and unauthorized control, theft, possession, transfer, or use of property. (Smith Aff., Exs. B–C.) Only Gohl received any other discipline during his time in the SOTP, when he was sanctioned with the loss of privileges in May 2013 for hoarding canteen items in a prison classroom. (*Id.*, Ex. D.) Gohl pleaded guilty to rule violations involving disorderly conduct and unauthorized control, theft, possession, transfer, or use of property. (*Id.*) The white inmates' disciplinary records do not support the proposition that they were similarly situated to Seenyur in all relevant respects, including by having been accused or convicted by prison staff of threatening others, or that they were treated more favorably. Indeed, according to the unrebutted testimony of Nancy Stacken, MCF-RC's Psychological Services Director, "[t]here have been no instances in the past where a staff member was threatened by a SOTP participant and allowed to continue in the program." (Stacken Aff. ¶ 8.)

Second, the other evidence in the record fails to support a reasonable inference that Coolidge intentionally discriminated against Seenyur because of his race. The record shows that, between 2010 and 2015, approximately 57% of SOTP participants were white, 29% were black, and 25% of each race were terminated from the SOTP before completing the program.[9] (*Id.* ¶ 7; Moler Aff., Ex. B, Def.'s Answers to Interrogs. 3–4.) Those statistics belie the notion that Coolidge, who served as the SOTP's Clinical Program Director throughout several of those years, made termination decisions on the basis of race. Because the evidence, even when viewed in Seenyur's favor, fails to reveal specific facts raising a genuine issue as to whether Coolidge terminated him from the SOTP because of his race, Coolidge is entitled to summary judgment on his equal protection claim.

---

[9]     Seenyur alleges that, during Coolidge's tenure, only 5% of SOTP participants were African-American and 4% of them never completed the program. (Doc. No. 5 at 10.) Those allegations are not enough to withstand summary judgment because they are unsupported by any actual evidence in the record, are contradicted by the existing evidence, and otherwise appear to be based on Seenyur's own anecdotal speculation, rather than actual knowledge of the complete demographic makeup and termination rates of SOTP participants during the two-year period that Coolidge served as its Clinical Program Director. *See Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (explaining that the non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy") (quotation and brackets omitted); Fed. R. Civ. P. 56(c) (providing that a party asserting a fact must support it by "citing to particular parts of materials in the record," including sworn affidavits "made on personal knowledge" by one who is "competent to testify on the matters stated"). Indeed, Seenyur only participated in the SOTP for the six-month period from June 14, 2013, through December 12, 2013, far less than Coolidge's full tenure with the program.

## IV. SEENYUR'S MOTION TO AMEND HIS COMPLAINT

On July 14, 2016, twenty-one months after he initiated this case, sixteen months after the scheduling order's deadline for amendments, and six months after Coolidge moved for summary judgment, Seenyur filed a motion for leave to amend his complaint. (Doc. No. 97.) Principally, Seenyur seeks to add Lieutenant Van Coolidge as a defendant and to assert an additional claim that his transfer to MCF-Stillwater placed him in imminent danger at the hands of Thomas Fox's fellow "gang members and relatives." (*Id.* at 2–6; *see also* Doc. No. 98, Pl.'s Mem. in Supp. of Mot. for Leave to Am. 3.) Contrary to his earlier affidavit, which stated that he was transferred from MCF-Stillwater under a "secret and confidential security" order unknown to anyone at MCF-RC (*see* Pl.'s Aff. 3), Seenyur now seeks to allege that "[i]t was documented in the computer at central office and throughout the prison administrations that [he] had enemies at [MCF-Stillwater] and had just been transferred from [there] eight months earlier due to a hostile general population and incompatibilities." (Doc. No. 98 at 5.) He therefore claims that Van Coolidge "knew or should have known of the great danger" posed by sending him back to MCF-Stillwater.[10] (Doc. No. 97 at 6; *see also* Doc. No. 98 at 5.)

---

[10]     In his proposed amended complaint, Seenyur also acknowledges that seven inmates, including Gohl, Piner, Schaper, and Thorstad, were terminated from the SOTP "in 2013 . . . and within the same month as [he was]." (Doc. No. 97 at 5.) He nevertheless maintains that those inmates were never transferred out of MCF-RC or placed in solitary confinement. (*Id.* at 5, 7; *see also* Doc. No. 98 at 6.) That, however, was not the basis for the equal-protection claim asserted in Seenyur's underlying complaint and, as will be explained, he has not shown good cause for seeking to amend his complaint at this late date. In any event, the additional allegations contained in Seenyur's proposed amendment would not preclude summary judgment on his equal protection claim because, as

(Footnote Continued on Next Page)

Although Seenyur relies on Rule 15(a)'s liberal amendment standard, which provides that a court "should freely give leave when justice so requires," his motion to amend is actually governed by Rule 16(b)'s good-cause standard because the Court's pretrial scheduling order set a deadline of June 5, 2015, for seeking to amend the pleadings. (*See* Doc. No. 23, Pretrial Scheduling Order 1); *Kozlov v. Assoc. Wholesale Grocers, Inc.*, 818 F.3d 380, 395 (8th Cir. 2016) (holding that when "the district court has established a deadline for amended pleadings," a plaintiff seeking to amend his complaint must meet Rule 16(b)'s required "showing of good cause") (quotation omitted); *Hartis v. Chi. Title Ins. Co.*, 694 F.3d 935, 948 (8th Cir. 2012) ("Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a).") (quotation omitted). Seenyur, however, has not addressed the question of good cause or otherwise shown that he diligently attempted to meet the scheduling order's deadline and that "a change in the law, the discovery of new facts, or some other change in circumstances" provides good cause for not seeking to assert his new claims earlier. *Hartis*, 694 F.3d at 948–49. Indeed, Seenyur's motion was filed sixteen months after the scheduling order's deadline and this Court can discern no reason why he could not have asserted a claim regarding the alleged danger he faced at MCF-Stillwater in his original

(Footnote Continued from Previous Page)
discussed, the evidence shows that Gohl, Piner, Schaper, and Thorstad were not similarly situated to him in all relevant respects, and Seenyur has not shown that any of the other inmates identified in his proposed amended complaint were so situated. *See Klinger*, 31 F.3d at 731 ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection.").

complaint or before the amendment deadline expired on June 5, 2015. *See Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003) (affirming the denial of leave to amend to add a claim for punitive damages where the plaintiff waited "ten months after the district court entered its scheduling order" and provided "no reason why punitive damages could not have earlier been alleged" or "why her motion to amend was filed so late").

Further, although prejudice to the defendant is largely irrelevant under Rule 16(b)'s good-cause standard, allowing Seenyur to amend his complaint at this late date (*i.e.*, more than two years after he initiated this case and after the parties' summary-judgment materials have all been submitted) would prejudice both Coolidge and Van Coolidge by "requiring a re-opening of discovery with additional costs." *See Kozlov*, 818 F.3d at 398; *see also Hartis*, 694 F.3d at 948 ("We generally will not consider prejudice to the nonmovant if the movant has not been diligent in meeting the scheduling order's deadlines.") (quotation and brackets omitted). Accordingly, Seenyur's motion for leave to amend should be denied, and any new claims, allegations, or evidence contained in his proposed amended complaint ignored for purposes of these summary-judgment proceedings.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant Jennifer Coolidge's Motion for Judgment on the Pleadings and for Summary Judgment (Doc. No. 61) be **GRANTED**;

2.      Plaintiff Antonio Seenyur's motion for leave to amend his complaint (Doc.

No. 97) be **DENIED**;

3.      This action be **DISMISSED WITH PREJUDICE**; and

4.      Plaintiff's Motion for Appointment of Counsel (Doc. No. 85) be **DENIED**

**AS MOOT**.


Date: July 21, 2016                          *s/ Becky R. Thorson*_____
                                             BECKY R. THORSON
                                             United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report and Recommendation by **August 5, 2016**. A party may respond to these objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).